UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
YASMEEN MITCHELL,

               Plaintiff,             **MEMORANDUM & ORDER**
                                            CV 05-4957 (WDW)

     -against-

THE COUNTY OF NASSAU, NASSAU COUNTY
POLICE DEPARTMENT, CABLEVISION SYSTEMS
CORPORATION, CABLEVISION SYSTEMS NEW
YORK CITY CORPORATION, DETECTIVE
CHRISTOPHER J. FERRO, in his individual and
official capacities, and TONY VENTURELLA, in his
individual and official capacities, JOHN DOE, in his
individual and official capacities, and JEFF EISEMAN,
in his individual and official capacities,

               Defendants.
------------------------------------------------------------------X

**APPEARANCES:**
Law Offices of Frederick K. Brewington
50 Clinton Street, Suite 501
Hempstead, New York 11550
Gregory Calliste, Jr., Esq., Attorney for Plaintiff

Office of the Nassau County Attorney
One West Street
Mineola, New York 11501
Sara A Wells and Jennean R. Rogers, Attorneys for Defendants County of Nassau, Nassau
      County Police Department, and Christopher J. Ferro

Akin Gump Strauss Hauer & Feld LLP
590 Madison Avenue
New York, New York 10022
Christine D. Doniak and John W. Berry, Attorneys for Defendants Cablevision Systems
      Corporation, Cablevision Systems New York City Corporation, Jeff Eiseman, Tony
      Venturella, and John Doe

**WALL, Magistrate Judge:**

     Before the court are two motions for summary judgment made by the defendants in this

case.  One motion was submitted by defendants Cablevision Systems Corporation, Cablevision

Systems New York City Corporation, Jeff Eiseman, Tony Venturella, and John Doe (collectively, the "Cablevision defendants"), *see* Docket Entry ("DE") [88], and the other by defendants County of Nassau, Nassau County Police Department, and Christopher J. Ferro (collectively, the "County defendants"). *See* DE [93]. Plaintiff Yasmeen Mitchell ("Mitchell") has opposed the motions.

For the reasons set forth herein, the motions are granted as to the federal law claims, and the remaining state law claims are dismissed without prejudice.

## BACKGROUND

The material facts, drawn from the Amended Complaint and the parties' Rule 56.1 Statements, are undisputed unless otherwise noted.

### Cablevision's Investigation of Plaintiff's Use of its Services

Plaintiff Mitchell is an African American female who resided in apartment B1 of the building located at 145 Terrace Avenue, Hempstead, New York, starting in September 2003. In October 2003, Mitchell subscribed to cable television service from Cablevision. Her subscription was terminated at the end of December 2003. Cablevision claims the service was disconnected due to non-payment, *see* Cablevision 56.1 Statement at ¶81, DE [71] ("Cablevision Stmt"), while plaintiff claims she voluntarily contacted Cablevision and instructed it to discontinue her service. Pl. 56.1 Counter-Statement at ¶81, DE [81] ("Pl. Counter-Stmt/Cablevision"). Plaintiff claims that after she returned cable equipment to Cablevision, she owed a balance of $91 for services rendered. *Id.* ¶83.

The events surrounding the alleged cable connection to plaintiff's apartment in 2004 are contested. The apartment building had a central location referred to by the parties as a "lock

box" or "junction box." Generally, Cablevision's cable signals went first to a junction box. Cablevision Stmt ¶18. At this location, one or more distribution taps would distribute the cable signal to individual apartments through separate cables. *Id.* ¶19. Each cable would be labeled with a tag or tags to designate which apartment the cable was connected to, the Cablevision account and customer number. *Id.* ¶¶23-24. If a resident did not subscribe to cable or if that resident's subscription had ended, "the cables running from those apartments would not be connected to a port on the distribution tap so that that person's apartment could not receive cable signals." *Id.* ¶21. In addition, a locking device would be attached to unused ports on the distribution taps to prevent unauthorized connections. *Id.* ¶22. Plaintiff claims that these generalities are not material to whether this set-up existed at plaintiff's apartment building. She does, however, seemingly concede that there was such a junction box or "common spot" in her apartment building. Pl. Counter-Stmt/Cablevision ¶11. She further argues that the junction box in her building was not secured or locked, but rather was wide open and in disarray. *See, e.g., id.* ¶18.

Cablevision has described its three stage audit process regarding unauthorized cable connections. Pursuant to an audit schedule, all Cablevision connections were subjected to a primary audit. Cablevision Stmt ¶34. If the field audit technician discovered an unauthorized connection during the primary audit, a second pass would be scheduled to recheck the connection. *Id.* If an unauthorized connection was discovered during a second pass audit, the technician would disconnect the connection and place a locking device on the port. *Id.* ¶35. A third pass audit would be conducted on any unauthorized connection discovered on the second pass audit. *Id.* ¶36. During each step of the process, Cablevision's technicians documented their

actions by utilizing the "Cabledata" computer data base and by taking photographs on the second and third passes. *Id.* ¶¶39, 42.

Cablevision has provided affidavits from the three technicians who performed the audit process in this case as well as the documentation regarding those audits. The primary audit was conducted on February 13, 2004. According to the technician, based upon his review of the Cabledata, he found an unauthorized connection of the cable connection at plaintiff's residence, he reported the same to the Cablevision coordinator, and he "disconnected and locked the unauthorized connection at the port so that this information could be recorded in Cabledata." Bieber Aff., ¶31, DE [74]. The second pass audit was conducted on April 15, 2004, at which time the technician reported the discovery of an unauthorized connection to plaintiff's apartment and took the same actions as above, as well as taking a digital photograph of the unauthorized connection. Kollar Aff., ¶¶38-41, DE [75]. The photo shows a connected cable that is affixed with a red tag labeled "B1." *Id.* Ex. C. The third pass audit took place on May 18, 2004. The technician found that "the locking device, which had been securing the port that used to be attached to this cable, had been removed and that this cable was spliced onto that port to establish an unauthorized connection." Driscoll Aff., ¶35, DE [76]. The technician again disconnected and locked the unauthorized connection "at the port" and photographed the connection. *Id.* ¶¶33, 36. The unauthorized connection was made by removing the locking device on a port and connecting the cable that ran to plaintiff's apartment to that port. *Id.* ¶¶29-30.

Although plaintiff disputes Cablevision's statements regarding the audit process as applied to her case, she does not truly dispute whether the technicians performed their duties as they described. She contends, however, that Cablevision technicians only checked to see if there

was an unauthorized connection at the junction box, but never checked to see if that connection was in fact going to plaintiff's apartment.  Pl. Counter-Stmt/Cablevision ¶11.  She repeatedly states that Cablevision "never determined if Plaintiff had an unauthorized connection to _Plaintiff's dwelling._"  *See, e.g., id.* ¶¶97-110 (emphasis in original).   Her implied argument is that since they never physically followed the wire back to her apartment, they could not be certain, despite the labeling, that the cable actually terminated in her apartment.[1]

At some point during Cablevision's audit process, plaintiff's case was assigned to defendant Tony Venturella, an investigator in its Cable & Communications System Security ("C&CSS") division.  Cablevision Stmt ¶116.   Venturella's supervisor was defendant Jeff Eiseman, the Director of the C&CSS division.  *Id.* ¶¶2-3.  As part of his investigation, Venturella created a hard-copy case file and a data-entry cover sheet to record information regarding the investigation.  *Id.* ¶¶118-19.  On or about April 16, 2004, Cablevision sent plaintiff a letter stating in part that "[d]uring a routine audit of our cable system, we found an apparent unauthorized connection to your home.  We have therefore, removed the connection from our cable system."  *See* Ltr. of 4/16/04, Venturella Aff., Ex. A.  The letter further stated "[p]lease be aware that theft of cable service is a violation of both Federal and State law."  *Id.*  After the third pass audit, Cablevision sent a second letter to plaintiff on or about May 20, 2004.  Cablevision

---

[1]She further suggests that the cable coming off the junction box that was tagged for her apartment was connected to another apartment as well. *Id.* ¶¶76-77.  Plaintiff refers to Cablevision's documents as evidence that the alleged other apartment belonged to someone named "B. Galloway, Jr." *Id.* Cablevision says that the record simply shows that B. Galloway lived in the same apartment, number B1, in 2006, after Mitchell had moved. *See* Pl's Ex. S; Cablevision Mem. at 22.

Stmt ¶122.[2]   The May 20th letter referenced Cablevision's discovery of an unauthorized

connection to the cable system on the second and third pass audit dates of April 15, 2004 and

May 18, 2004, again advised plaintiff that "theft of cable service is a violation of Federal and

State Law, punishable by severe monetary sanctions and a possible prison sentence," and warned

that "any future violations will result in additional legal action."   *See* Ltr. of 5/20/04, Venturella

Aff., Ex. A.   Both letters were sent by defendant Eiseman in his capacity as Director of the

C&CSS division.

Plaintiff acknowledges receiving the letters from Cablevision in April and May of 2004.

*See* Pl. Counter-Stmt/Cablevision Ex. A, Mitchell 50-h transcript at 30:4-12.   She has testified

that she disregarded the first letter, but called Cablevision upon receipt of the second letter.   *Id.*

31:6-8.   It was during this call on June 1, 2004 that she allegedly spoke with defendant John Doe,

a Cablevision customer service representative.   2d Am. Compl. at ¶¶45-46.   At this time, she

claims to have asked Cablevision to "please send someone out to my apartment to come cut the

wire."   Mitchell 50-h transcript at 41:13-15.   According to plaintiff, although she was told

someone would be sent out to disconnect the wire, nobody knocked on her door to report that the

disconnect had been completed, and she did not hear from Cablevision again from May to

October 2004.   *Id.* 44:5-22.   Plaintiff also testified that there was a "connection" up to October

24, 2004 and that she received channel twelve and TNT, although the latter was "staticky."

--------

[2]Although plaintiff "Disputed" both statements in Cablevision's 56.1 Statement regarding
the sending of the letters, her "dispute" is based on the underlying characterization of the
unauthorized cable connections and what Cablevision did, or did not do, in regard to the
connection to her actual apartment.   She does not, however, dispute that the letters were sent, nor
does she suggest that she did not receive those letters.   *See* Pl. Counter-Stmt/Cablevision ¶¶121,
122.

*Id.* 37:14 - 39:14. Cablevision notes that TNT can only be received through a cable connection. Naughton Aff. ¶5.

Cablevision has no record of her call on June 1, 2004 and states that Cablevision procedures would have required the logging of such a call. *See* Eiseman Aff. ¶42. Cablevision further notes, citing plaintiff's telephone records, that plaintiff *did* place a call to Cablevision on June 1, 2004, but that call lasted only 3 seconds. Acevedo Aff. ¶7 & Ex. A. Cablevision further states that its records do indicate that it received a call on May 3, 2005 and that the caller during this call, made well after Mitchell's arrest, "stated that she was not supposed to have cable but its [sic] on." Cablevision Stmt ¶196; Eiseman Aff. ¶43 & Ex. A.

**Cablevision's Reporting of Alleged Theft of Services & Nassau County Police Response**

On or about July 1, 2004, Venturella reported plaintiff to the Nassau County police department for theft of services. At that time, he provided the police with the Cablevision investigative case files for alleged unauthorized cable for plaintiff as well as others. Defendant Detective Ferro was assigned to the investigation of approximately ten complaints, including the one against plaintiff, and he met with Venturella on July 1, 2004 regarding Cablevision's complaints. Prior to July 1, 2004, Venturella had never met Ferro.

There was no activity by the police on Cablevision's complaint between July 1 and October 24, 2004, nor was there any contact in this time frame between the police and Cablevision regarding the complaint. On October 24, 2004, Ferro and Detective Mercado went to plaintiff's apartment "to investigate Cablevision's complaint that an unauthorized cable connection existed at that location." County Defs' Rule 56.1 Statement ("County Stmt") ¶23. Plaintiff argues that Ferro did not conduct an independent investigation but rather went to

7

plaintiff's apartment to arrest her based on the information previously provided by Venturella. Pl. 56.1 Counter-Statement at ¶23, DE [83] ("Pl. Counter-Stmt/County").

Prior to knocking on the door, Ferro observed a coaxial cable entering plaintiff's apartment above the door. Ferro knocked on the door, identified himself and Detective Mercado as Nassau County police detectives to plaintiff, and told her they were there to investigate Cablevision's complaint. The detectives entered the apartment at plaintiff's invitation. Also present in the apartment for at least some of the time was plaintiff's then-boyfriend, William Flowers. At this juncture, the version of events given by Mitchell and Ferro diverge. None of the parties have provided affidavits or deposition testimony from either Mercado or Flowers.[3]

The County defendants claim that plaintiff told Ferro that she "should not be receiving Cablevision's cable services and that the whole building was receiving illegal cable." County Stmt ¶29. They further claim that plaintiff voluntarily turned her television to channel 12 at Ferro's request, and that there was programming visible on that channel. *Id.* ¶31. Ferro "was aware that News 12 Long Island, which appeared on channel 12, was a service offered exclusively by Cablevision in the Long Island area." Ferro Aff. ¶22. Plaintiff claims that she did not make the statements to Ferro, Pl. Counter-Stmt/County ¶29, and that Ferro "never turned on the television at Plaintiff's apartment at any time when they visited her apartment to conduct their alleged investigation." *Id.* ¶31. Moreover, plaintiff points to Ferro's testimony that there was nothing on the programming he saw that indicated that it was coming from cable channel 12.

_____

[3]Plaintiff was directed to provide updated contact information for Flowers by a date certain or be precluded from providing an affidavit from him in opposition to this motion, *see* Order of 3/9/09, DE [68], and according to the Cablevision defendants, she did not provide the requested information. *See* Ltr. of 3/31/09, DE [69]. While this failure explains the lack of testimony from Flowers, the absence of any testimony from Mercado is a complete mystery.

*Id.*

The County defendants claim that based upon his investigation at plaintiff's residence, Ferro determined that she was receiving cable services through an unauthorized connection. County Stmt ¶32. Plaintiff counters that Ferro did not conduct an investigation, and he did not see anything that established any unauthorized cable connection. Pl. Counter-Stmt/County ¶32. The parties do not dispute that Ferro advised plaintiff that she was going to be charged with theft of services and that she was told that she would be taken to the police precinct and released on an appearance ticket if she did not have any outstanding warrants.

Detective Ferro called Venturella on October 24th, told him that the police had conducted an investigation and, as a result of that investigation, had arrested plaintiff. Venturella Aff. ¶46. Ferro asked Venturella to come to the precinct to prepare and sign a statement. Cablevision Stmt ¶¶147-48. In that statement or "Supporting Deposition," Venturella reviewed the discovery of unauthorized connections in April and May 2004, verified that two letters were sent to plaintiff, and concluded "I want Yasmeen R. Mitchell arrested for the unauthorized connection into Cablevision cable system." Venturella Aff., Ex. C.

As to the timing of her arrest, the parties do not dispute that plaintiff was en route to the precinct by 12:01 p.m. on October 24th, where she was charged with the misdemeanor crime of theft of services under New York Penal Law 165.15(4), issued a desk appearance ticket returnable on November 9, 2004, and released prior to 4:35 p.m. on October 24th. Plaintiff does not allege any physical injuries as the result of her arrest, *see* Pl. Counter-Stmt/County ¶47, but claims various emotional and consequential damages. *Id.*¶¶49-50.

**Underlying Criminal Proceeding**

Prior to trial, a *Huntley* hearing was held to determine the admissibility of the oral statements made by plaintiff to Ferro in her apartment on October 24, 2004. Those statements were found to be admissible. Decision of 12/15/05, Berry Aff. Ex. F. The criminal trial commenced with jury selection on January 30, 2007. At the close of the prosecution's case, the trial court issued an order of dismissal in Mitchell's favor. Trial Tr. at 395:21-22.

**Procedural History of Civil Litigation**

On October 24, 2005, plaintiff commenced this case. On May 24, 2007, District Judge Feuerstein[4] granted in part and denied in part the Cablevision defendant's motion to dismiss. *See Mitchell v. County of Nassau,* 2007 WL 1580068, at *1 (E.D.N.Y. May 24, 2007).[5] Plaintiff was given permission to file an amended complaint to "replead her malicious prosecution claim" and did so. The operative complaint in this matter is the Second Amended Complaint dated May 12, 2008. *See* 2d Am. Compl., DE [40].

For reasons that are not readily apparent, the Second Amended Complaint also contains claims expressly dismissed by Judge Feuerstein. Specifically, Judge Feuerstein dismissed 1) plaintiff's §1986 claim against Eiseman, 2) plaintiff's malicious prosecution and false arrest claims against Eiseman and "John Doe," and 3) plaintiff's negligence claim against the Cablevision defendants. *Mitchell,* 2007 WL 1580068, at *13. As these claims have already been dismissed, they will not be considered on these motions. In addition, plaintiff has indicated

---

[4]The parties consented to my jurisdiction for all purposes on December 4, 2008.

[5]Judge Feuerstein adhered to the outcome of this Order upon her determination of a motion for reconsideration. *See* Opinion & Order of 4/17/08, DE [36].

in her brief in opposition to Cablevision's motion that she is withdrawing her claims based upon 42 U.S.C. §§1985 and 1986. *See* Pl. Opp/Cablevision at 1, 18. Accordingly, those claims (Third, Fourth) are deemed withdrawn and dismissed from this action.

As against the County defendants, the following claims remain: false arrest and malicious prosecution under §1983 and state law (First & Fifth), §1983 municipal liability (Second), negligence (Seventh), and "vicarious liability" (Ninth). As to the Cablevision defendants, the following causes of action remain: "vicarious liability" (Eighth), respondeat superior for the negligent hiring, supervision, and retention of Eiseman, Venturella, and John Doe. (Tenth), and state law claims for false arrest and malicious prosecution against Cablevision, and Venturella. (Fifth). Additionally, plaintiff in her opposition papers argues that she has adequately pled a §1983 conspiracy claim against all defendants. If accepted, this would be the sole federal cause of action against the Cablevision defendants. The defendants argue that it is too late to present such a claim, and that any such claim would fail as a matter of law.

## DISCUSSION

### I. Summary Judgment Standards

"'Summary judgment is appropriate where there are no genuine disputes concerning any material facts, and where the moving party is entitled to judgment as a matter of law.'" *Jamaica Ash & Rubbish Removal Co. v. Ferguson,* 85 F. Supp. 2d 174, 180 (E.D.N.Y. 2000) (quoting *In re Blackwood Assocs., L.P.* 153 F.3d 61, 67 (2d Cir. 1998) and citing Fed. R. Civ. P. 56(c) and *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). In deciding a summary judgment motion, the district court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the opposing party. *See Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.,* 150

F.3d 132, 137 (2d Cir. 1998). If there is evidence in the record as to any material fact from which an inference could be drawn in favor of the non-movant, summary judgment is unavailable. *See Holt v. KMI-Continental, Inc.,* 95 F.3d 123, 128 (2d Cir. 1996). The applicable substantive law determines which facts are critical and which are irrelevant. *See Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986).

The trial court's responsibility is "'limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution.'" *B.F. Goodrich v. Betkoski,* 99 F.3d 505, 522 (2d Cir. 1996) (quoting *Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1224 (2d Cir. 1994)). When, however, there is nothing more than a "metaphysical doubt as to the material facts," summary judgment is proper. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "Rather, there must exist 'specific facts showing that there is a genuine issue for trial' in order to deny summary judgment as to a particular claim." *Jamaica Ash & Rubbish,* 85 F. Supp. 2d at 180 (quoting *Celotex,* 477 U.S. at 322). To defeat a motion for summary judgment, "the non-moving party must provide this Court 'with some basis to believe that his version of relevant events is not fanciful.'" *Dove v. City of New York*, 2007 WL 805786, at *4 (E.D.N.Y. Mar. 15, 2007) (quoting *Lee v. Coughlin*, 902 F.Supp. 424, 429 (S.D.N.Y.1995) (citation omitted)).

A moving party may obtain summary judgment by demonstrating that little or no evidence may be found in support of the non-moving party's case. "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Marks v. New*

*York Univ.,* 61 F. Supp. 2d 81, 88 (S.D.N.Y. 1999). Moreover, the non-moving party "must produce evidence in the record and 'may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible.'" *Singh v. New York City Off-Track Betting,* 2005 WL 1354038, at *1 (S.D.N.Y. June 8, 2005) (quoting *Ying Jing Gan v. City of New York,* 996 F.2d 522, 532 (2d Cir. 1993)). Where, however, evaluation of the non-movant's proof rests on the credibility of the non-movant versus the movant, a genuine issue exists and summary judgment cannot be granted. "Where an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate." *See* Wright, Miller & Kane*, Federal Practice and Procedure,* Vol. 10A, §2726 (quoting Advisory Committee Notes to 1963 amendment of Rule 56(e)). With the summary judgment standards in mind, the court now turns to the issues presented on this motion.

## II.      Federal Claims under 42 U.S.C. §1983

Section 1983 provides that no person may deprive another, under color of state law, of rights secured by the Constitution or the laws of the United States. 42 U.S.C. §1983. To state a claim under §1983, plaintiff must establish (1) that the challenged conduct was "committed by a person acting under color of state law," and (2) that such conduct "deprived [plaintiff] of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Cornejo v. Bell,* 592 F.3d 121, 127 (2d Cir.), *cert. denied,* 131 S. Ct. 158 (2010) (*quoting Pitchell v. Callan,* 13 F.3d 545, 547 (2d Cir. 1994)). Here, plaintiff's §1983 constitutional claims are for false arrest and malicious prosecution in violation of the Fourth Amendment, a municipal liability

claim under *Monell,* and a conspiracy claim involving all defendants.[6]

**A. False Arrest - County defendants**

In analyzing a plaintiff's claim of false arrest, courts in this Circuit look to the law of the state in which the arrest took place. *See Davis v. Rodriguez,* 364 F.3d 424, 433 (2d Cir. 2004). Under New York law, plaintiff establishes a claim for false arrest by establishing that (1) defendants intended to confine her, (2) she was conscious of the confinement, (3) she did not consent to be confined, and (4) the confinement was not otherwise privileged. *Parisi v. Suffolk County,* 2009 WL 4405488, at *5 (E.D.N.Y. Nov. 30, 2009) (*citing Singer v. Fulton County Sheriff,* 63 F.3d 110, 118 (2d Cir. 1995)). There does not appear to be any dispute regarding the first three factors. Defendants contend that the false arrest claim must fail because the arresting officers had probable cause to arrest plaintiff and thus was otherwise privileged. *See Shain v. Ellison,* 273 F.3d 56, 67-68 (2d Cir. 2001) ("An arrest made on probable cause is privileged").

"Under New York law, the existence of probable cause is an absolute defense to a false arrest claim." *Jaegly v. Couch,* 439 F.3d 149, 152 (2d Cir. 2006); *see also Weyant v. Okst,* 101 F.3d 845, (2d Cir. 1996) (noting that probable cause to arrest is a complete defense to an action for false arrest "whether that action is brought under state law or under §1983" (citations omitted)). Where there is "no dispute as to the pertinent events and the knowledge of the officers," the existence of probable cause may be determined as a matter of law. *Weyant,* 101 F.3d at 852.

---

[6]The County defendants briefly discuss plaintiff's purported Fifth Amendment and Equal Protection claims. Plaintiff's opposition, however, is limited to her false arrest and malicious prosecution claims, characterized as her "remaining claims against County Defendants." Pl. Mem. in Opp/County, at 1.

In determining whether probable cause for arrest existed, the court focuses on the facts available to the arresting officer at the time of the arrest. "Probable cause exists when, based on the totality of circumstances, the officer has 'knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested.'" *Finigan v. Marshall,* 574 F.3d 57, 62 (2d Cir. 2009) (*quoting Zellner v. Summerlin,* 494 F.3d 344, 368 (2d Cir.2007)); *see also Caldarola v. Calabrese,* 298 F.3d 156, 162 (2d Cir. 2002) (the court must consider "those facts available to the officer at the time of the arrest and immediately before it"). Applying these standards, I find that there was probable cause to arrest plaintiff for theft of services under New York law.

Plaintiff was charged with violating New York Penal Law §165.15(4), a class A misdemeanor. That statute states, in part, that a person is guilty of theft of services when

> With intent to avoid payment by himself or another person of the lawful charge for any telecommunications service, including, without limitation, cable television service . . . he obtains or attempts to obtain such service for himself or another person or avoids or attempts to avoid payment therefor by himself or another person by means of (a) tampering or making connection with the equipment of the supplier, whether by mechanical, electrical, acoustical or other means . . .

N.Y. Penal Law §165.15(4). Venturella, on behalf of Cablevision, filed a report with the police against plaintiff for theft of services. It is well-established in this Circuit that "'absent circumstances that raise doubt as to the victim's veracity,' a victim's report of a crime is generally enough, by itself, to establish probable cause." *Koester v. Lanfranchi,* 288 Fed.Appx. 764, 766 (2d Cir. 2008) (*quoting Singer* 63 F.3d at 119); *see also Curley v. Village of Suffern,*

268 F.3d 65, 70 (2d Cir. 2001) ("When information is received from a putative victim or an eyewitness, probable cause exists unless the circumstances raise doubt as to the person's veracity" (internal citations omitted)); *Little v. City of New York,* 487 F. Supp. 2d 426, 439 (S.D.N.Y. 2007) ("It is well-settled that police officers have probable cause to arrest if they receive information from a complaining victim or other witness whom they reasonably believe to be telling the truth"). Plaintiff has not suggested that the police had any reason to doubt the trustworthiness of Cablevision's report regarding plaintiff's alleged theft of services. Indeed, the arguments set forth by plaintiff impliedly acknowledge that probable cause may be based solely upon the complaint lodged by Cablevision. For example, she argues that probable cause "had attenuated on the date of Plaintiff's arrest" and that the three-month gap between Cablevision's initial complaint at the arrest had the effect of "attenuat[ing] probable cause and creat[ing] a duty, in the police, to do further investigation." Pl. Opp/County at 8, 9. Thus, she seems to suggest that while probable cause may have existed on July 1, 2004 when Venturella made the initial complaint, the mere passage of time served to create an issue of fact as to the existence of probable cause.

The case relied on by plaintiff for this proposition is readily distinguishable. In *Cornett v. Brown,* the complainant filed a report for trespass with the police against Cornett, and upon which the police took "no independent action." *Cornett v. Brown,* 2007 WL 2743485, at *1 (E.D.N.Y. Sept. 17, 2007), *aff'd by Cornett v. Jamison,* 326 Fed.Appx. 624 (2d Cir. 2009). Three months after the filing of the report, the complainant called the precinct to inform the police of the whereabouts of Cornett, "who was wanted on a criminal trespass complaint." *Cornett,* .2007 WL 2743485, at *1. Based on this call alone, the officer that received the phone

call directed another officer to arrest Cornett. *Id.* The court found that the "three-month gap between the filing of the complaint and any apparent police activity in the case allows an inference that the complaining witness was not credible." *Id.* at \*6. Thus, the fact of the delay did not serve to dissipate probable cause, but rather went to the reasonableness of the officer's reliance upon the complainant. *See Sheikh v. City of New York,* 2008 WL 5146645, at \*6 (E.D.N.Y. Dec. 5, 2008) (citing *Cornett* for the proposition that "an unsigned complaint in combination with other indicia or unreliability could support the conclusion that probable cause was lacking"). As discussed *supra,* plaintiff does not argue, nor does she provide any evidence, that Ferro could not rely upon Venturella's report because it was incredible or untrustworthy.

The *Cornett* court stated that, alternatively, "the three-month gap allows an inference that the police did not believe that plaintiff's alleged actions actually constituted an [sic] crime, or that they constituted so minor a crime as to not warrant any further police action." *Cornett,* 2007 WL 2743485, at \*6. That court cited no precedent for this proposition, nor did it discuss the implications of such a rule. Imposing a requirement that police investigate crimes within a certain time frame would intrude upon the police's ability to set priorities in managing criminal complaints. There is no evidence here that the police did not believe Venturella, and the fact that Ferro did not take any action on the report for over three months does not, by itself, create an issue of material fact regarding the existence of probable cause.

Defendants were also entitled to rely upon the statutory presumption contained in Penal Law §165.15[4]. Relevant to plaintiff's case, the statute provides that in any prosecution under §165.15(4), proof that telecommunications equipment that

> has been connected to the equipment of the supplier of the service
> without the consent of the supplier of the service, shall be

17

> presumptive evidence that the resident to whom the service which
> is at the time being furnished by or through such equipment has,
> with intent to avoid payment by himself or another person for a
> prospective or already rendered service, created or caused to be
> created with reference to such equipment, the condition so existing.

§165.15(4).  A second presumption provides that "[a] person who tampers with such a device or

equipment without the consent of the supplier of the service is presumed to do so with intent to

avoid, or to enable another to avoid, payment for the service involved. . ." *Id.*

Plaintiff, apparently relying solely on the second presumption, argues that there was no

proof that plaintiff had tampered with the equipment and that as a result, the presumption is

unavailable.  The facts in this case, however, trigger the first presumption, which plaintiff does

not address.  Here, Cablevision's investigation produced evidence that there was an unauthorized

connection of the cable tagged B1 to the junction box, and thus showed that the cable had been

"connected to the equipment of the supplier of the service without consent of the supplier of the

service."  Penal Law §165.15[4].  This proof, according to the statute, "is presumptive evidence

that the resident to whom the service which is at the time being furnished by or through such

equipment has . . . created or caused to be created with reference to such equipment, the

condition so existing."  *Id.*  No affirmative proof of tampering is required; it is the unauthorized

connection of the B1 cable to the junction box that gives rise to the presumption that the resident

who receives service via the B1 cable, Ms. Mitchell, created or caused to be created the

unauthorized connection.

In addition, the finding of probable cause for arrest in this case does not rely solely upon

Cablevision's complaint or the statutory presumption, but also includes the police officer's

observations and discoveries on the date of the arrest which further direct a finding of probable

cause.  Ferro personally observed the coaxial cable running above the door to plaintiff's apartment, and he confirmed that Ms. Mitchell was, in fact, the resident of apartment B1.  Based on the information available to Ferro, including Cablevision's files and his observations, he was in possession of facts and circumstances sufficient to believe that an offense had been committed and accordingly probable cause existed for the arrest.

Plaintiff raises several other issues concerning probable cause.  Although these issues do not alter the conclusion that probable cause to arrest existed, they will be addressed in the interest of completeness.

Plaintiff argues that Ferro cannot rely upon Cablevision's "complaint" because Venturella did not sign his supporting deposition, characterized by plaintiff as a criminal complaint, until *after* Mitchell had been arrested.  To the extent that plaintiff claims that Venturella's supporting deposition cannot be used to establish probable cause at the time of her arrest, she is correct.  *See, e.g., Loria v. Gorman,* 306 F.3d 1271, 1292 (2d Cir. 2002) (contents of post-arrest supporting deposition are "irrelevant to the determination of . . . probable cause to arrest").  The statement signed by Venturella after plaintiff's arrest simply restates and verifies those facts previously reported by Cablevision, and those facts – that unauthorized connections had been discovered on April 15 and May 18, 2004 and that letters were sent to plaintiff regarding those connections – were already known to the arresting officer .[7]

Plaintiff also attempts to raise questions of fact that she claims are material to a

---

[7]Venturella further stated in his supporting deposition that the value of the services allegedly stolen was "in excess of one hundred dollars" and that "I want Yasmeen R. Mitchell arrested for the unauthorized connection into Cablevision cable system."  Venturella Supporting Dep., County Ex. G.   Neither of these statements would be necessary to Ferro's determination of probable cause to arrest plaintiff.

determination of probable cause and therefore prevent an award of summary judgment. The questions of disputed fact identified by plaintiff are her claim that, contrary to Ferro's testimony, she "never turned on her television," and that she never made "admissions of guilt" to him. Pl Mem. in Opp/County, at 10. Based on a review of the evidence, plaintiff has not demonstrated that an issue of fact exists as to her allegedly inculpatory statements to Ferro. The County defendants claim, based in part upon Ferro's affidavit and his memorialization of her statements in a Crime Report dated October 24, 2004, that plaintiff told Detective Ferro that she knew that she should not be receiving Cablevision's cable services, and that the whole building was receiving illegal cable. Plaintiff in her opposition claims that she did not make these statements, citing as evidence her testimony at the Section 50(h) hearing held on July 21, 2005 at pages 127-28. The cited portion of her testimony is as follows:

Q:     Regarding the time that the officers were in your home, on the Notice of Claim it states that it was later discovered that officers provided statements to the DA's office that were allegedly made by Ms. Mitchell. The contents of the statements were false, inaccurate and misleading. Can you tell me what statements were told that were false and inaccurate and misleading, and how you found out the statements were made?

A:     When I went to court and I got the –

Q:     What time?

A:     This is the November 9th court date. And I received all of the paperwork of who was the accuser and everything else. There was a report in there from the police, and when I read the report I noticed that there were a lot of things that they – I don't know the word for it.

Q:     Can you give me an example?

A:     Detective Ferro asked me how long was I with my boyfriend, and I told him two months. He put in the statement that he had been

> living with me for two months, and I never said he was living with me. I said we were together.
>
> Q: What else?
>
> A: There was something there, a time when he wrote – I'm not sure. I'd have to look at it in order to tell you what he wrote.
>
> Q: Do you still have the paperwork?
>
> A: Yes. I still have it.

Section 50(h) Hrg. at 127:13-128:17. Although a blank was left in the transcript for plaintiff to fill, there is no indication that any additions were ever made. A plain reading of the transcript is that Mitchell does not even address the statements that Ferro claims she made, much less flatly deny that she made them. This testimony, the only evidence cited by plaintiff, does not rebut Ferro's sworn statements and documentary evidence.

Moreover, defendants point to Mitchell's own testimony to further demonstrate that no issue of fact has been raised. When asked directly at her deposition about the statements Ferro swore she made, plaintiff testified only that she did not recall making them:

> Q: At any time while the detectives were at your apartment, did you tell them that you were receiving cable services?
>
> A: I don't recall that.
>
> Q: Did you tell them that you were receiving cable reception?
>
> A: I don't recall that.
>
> Q: Did you tell them that you were watching cable television?
>
> A: I don't recall that either.
>
> Q: Did you tell Detective Ferro that everyone in the building has illegal hookups?

A:      Yes.  But when I made that statement, it was more or less of you're
        coming to my house arresting me for theft of service, when it's like
        it goes on throughout the entire building.

Q:      So you had a problem with the fact that you were – you personally
        were being singled out?

A:      Yes.

Q:      Other than everyone else?

A:      Yes.

Q:      Did you tell Detective Ferro that you were not receiving cable
        services?

A:      I don't recall that.

Mitchell Dep., 230:6-231:7.  Plaintiff's assertion of a lack of memory is not a denial.  *See, e.g.,*

*Costello v. St. Francis Hosp.,* 258 F. Supp. 2d 144, 148 (E.D.N.Y. 2003) (finding deposition

responses of "I don't recall" or "I don't remember" insufficient to counter defendant's showing).

Thus, as to the issue of plaintiff's arguably inculpatory statements, the court is presented with

Ferro's affidavit and Crime Report created within hours of the arrest on one hand, and plaintiff's

failure to dispute those facts.  As such, I find there is no material issue of fact as to plaintiff's

statements made to Ferro prior to her arrest.

    The sole remaining disputed issue is whether the television was on in plaintiff's

apartment on the day of her arrest and if so, the import of what Ferro saw on the screen.  Plaintiff

plainly disputes Ferro's testimony regarding the television.  She testified that the television in the

living room was off and Ferro never asked her to turn it on.  Mitchell Dep. at 231.  Ferro testified

that the television was on, and that he asked her to turn it to channel 12.  Even resolving this

issue in plaintiff's favor, however, does not affect the determination that, under the totality of the

circumstances, probable cause existed for plaintiff's arrest.  I find that no reasonable jury, relying

on this fact alone, could find that probable cause did not exist.

Plaintiff makes much of the fact that there was no evidence, and no probable cause, to demonstrate that she was receiving illegal cable on October 24, 2004, the day of her arrest.[8] Cablevision's investigation concerned its discovery of plaintiff's alleged theft of services in April and May 2004, and thus, the proper inquiry is whether Ferro had probable cause to arrest her for that offense. A criminal who decides to turn over a new leaf and ceases current or future criminal activity does not, by this conduct, absolve himself of criminal liability for his previous misdeeds. Whether plaintiff was receiving illegal cable on the date of her arrest is immaterial to a finding of probable cause for her arrest on a charge of theft of services in April and May 2004.

For the above stated reasons, I find that in the totality of the circumstances, Ferro had probable cause to arrest plaintiff for theft of services. Accordingly, her claim for false arrest under both state and federal law must be dismissed.

**B. Qualified Immunity Defense**

Even if plaintiff's claim for false arrest were to survive defendants' motion for summary judgment, defendant Ferro is entitled to qualified immunity from suit for any constitutional violation claimed by plaintiff. A state actor such as a police officer may be shielded from liability if his conduct "did not violate plaintiff's clearly established rights or if it would have been objectively reasonable for the official to believe that his conduct did not violate plaintiff's rights." *Mandell v. County of Suffolk,* 316 F.3d 368, 385 (2d Cir. 2003). An officer accused of false arrest "is subject to suit only if his 'judgment was so flawed that no reasonable officer

---

[8]Plaintiff is not alone in this misapprehension, since the state court trial judge based the dismissal of the criminal complaint in part upon the prosecution's failure to provide evidence of the status of the junction box on October 24, 2004. Tr. Transcript at 396.

would have made a similar choice.'" *Provost v. City of Newburgh,* 262 F.3d 146, 160 (2d Cir.

2001) (*quoting Lennon v. Miller,* 66 F.3d 416, 425 (2d Cir. 1995)). The Second Circuit

acknowledges this low bar for entitlement to qualified immunity, noting that "[t]his forgiving

standard protects 'all but the plainly incompetent or those who knowingly violate the law.'"

*Provost,* 262 F.3d at 160 (*quoting Malley v. Briggs,* 475 U.S. 335, 341 (1986)).

It is beyond dispute that the right to be free from arrest without probable cause was

clearly established at the time of plaintiff's arrest on October 24, 2004.  *See generally Martinez v.

Simonetti,* 202 F.3d 625, 634 (2d Cir. 2000) (right not to be without probable cause is clearly

established "[w]ithout a doubt").  Thus the issue turns on whether Ferro acted with probable

cause as determined for qualified immunity purposes.  "When analyzing qualified immunity in

the context of a suit for damages based on an arrest allegedly without probable cause, a police

officer is immune from such suit 'if either (a) it was objectively reasonable for the officer to

believe that probable cause existed, or (b) officers of reasonable competence could disagree on

whether the probable cause test was met.'" *Pace v. Town of Southampton,* 678 F. Supp. 2d 79, 86

(E.D.N.Y. 2010) (*quoting Posr v. Court Officer Shield No. 207,* 180 F.3d 409, 416 (2d Cir. 1999)

(internal quotation omitted)).  So-called "arguable probable cause" exists "when a reasonable

police officer in the same circumstances and possessing the same knowledge as the officer in

question *could* have reasonably believed that probable cause existed in the light of well

established law." *Cerrone v. Brown,* 246 F.3d 194, 203 (2d Cir. 2001) (emphasis in original,

citation omitted).

Based on the facts presented here, I find that Ferro had, at the very least, arguable

probable cause for arresting plaintiff and thus his actions were objectively reasonable.  Thus,

Ferro would be entitled to qualified immunity even if the false arrest claim had survived this

24

motion.

### C. Malicious Prosecution - County defendants

As with the false arrest claim, the court looks to the law of New York to govern the §1983 claim for malicious prosecution. *See Rheingold v. Harrison Town Police Dep't,* 568 F. Supp. 2d 384, 392 (S.D.N.Y. 2008). To establish a malicious prosecution claim under New York law, plaintiff must prove "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Jocks v. Tavernier,* 316 F.3d 128, 136 (2d Cir. 2003) (citation omitted). A federal §1983 claim requires a fifth element, "that there was (5) a sufficient post-arraignment liberty restraint to implicate plaintiff's Fourth Amendment rights." *Rohman v. New York City Transit Auth.,* 215 F.3d 208, 215 (2d Cir. 2000) (as the claim arises under the Fourth Amendment, plaintiff must "show some deprivation of liberty consistent with the concept of 'seizure'"). The requirement of attending criminal proceedings satisfies the final requirement. *Jocks,* 316 F.3d at 136.

"The existence of probable cause is an absolute defense to a cause of action for malicious prosecution." *Maron v. County of Albany,* 166 Fed.Appx. 540, 541 (2d Cir. 2006). The existence of probable cause at the time of the arrest, however, may not be dispositive of the issue as to the malicious prosecution claim, because "[u]nder New York law, even when probable cause is present at the time of arrest, evidence could later surface which would eliminate that probable cause." *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 571 (2d Cir. 1996) (citations and internal quotations omitted). "[I]n order for the probable cause that existed at the time of arrest to 'dissipate' prior to commencement of the prosecution, the 'groundless nature of the charge must be made apparent to the [defendants] by the discovery of some intervening fact.'" *Hope v.*

*City of New York,* 2010 WL 331678, at *3 (E.D.N.Y. Jan. 22, 2010) (*quoting Kinzer v. Jackson,* 316 F.3d 139, 144 (2d Cir. 2003)).   For example, a prosecution that is continued despite the discovery of exculpatory evidence could eliminate probable cause.  *See Rizzo v. Edison,* 172 Fed.Appx. 391, 393-94 (2d Cir. 2006); *see also McDermott v. City of New York,* 1995 WL 347041, at *5 (E.D.N.Y. May 30, 1995) ("In the absence of some indication that the authorities became aware of exculpatory evidence between the time of the arrest and the subsequent prosecution that would undermine the probable cause which supported the arrest, no claim for malicious prosecution may lie").

Here, plaintiff has alleged no intervening facts which would have made it apparent to defendants that the theft of services charge was groundless.  She generally references "false evidence," but does not raise any new or intervening facts.  She also seems to suggest that the dismissal of her criminal case is significant to the determination of probable cause to commence the proceeding.  *See* Pl. Mem in Opp/County at 11.  Subsequent dismissal of claims or acquittal do not, however, have any effect upon the probable cause determination.  *Tartaglione v. Pugliese,* 89 Fed.Appx. 304, 305 (2d Cir. 2004); *Warren v. Byrne,* 699 F.2d 95, 98 (2d Cir. 1983); *see also Husbands ex rel. Forde v. City of New York,* 2007 WL 2454106, at *7 (S.D.N.Y. Aug. 16, 2007) ("it is important to keep in mind the distinction between probable cause and the evidentiary weaknesses in the case"), *aff'd,* 335 Fed.Appx. 124 (2d Cir. 2009);  *Carlisle v. City of New York,* 2007 WL 998729, at *3 (S.D.N.Y. Apr. 2, 2007) (noting that "acquittal is evidence of reasonable doubt, not lack of probable cause"); *Coleman v. City of New York*, 177 F. Supp. 2d 151, 158 n.5 (S.D.N.Y. 2001) (fact that witness could no longer positively identify defendant did not serve to exonerate him and although the case was weakened, it at no point became "futile"), *aff'd,* 49 Fed.Appx. 342 (2d Cir. 2002).

In addition, plaintiff has provided no evidence from which a reasonable jury could find malice. Malice in commencing a proceeding has been defined as "a wrong or improper motive, something other than a desire to see the ends of justice served." *Fulton v. Robinson,* 289 F.3d 188, 198 (2d Cir. 2002) (citation and internal quotations omitted). In her opposition, plaintiff argues that malice can be inferred from proof that there was no probable cause to either arrest or prosecute her. As I have found that there was probable cause as a matter of law, her arguments in this regard are unavailing. As she presents no other evidence of malice, she has failed to satisfy this factor of a successful malicious prosecution claim as well.

Accordingly, the plaintiff's claim for malicious prosecution under both state and federal law is dismissed.

### D. Municipal liability

Plaintiff asserts a cause of action for municipal liability under *Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658 (1978). *"Monell* does not provide a separate cause of action for the failure by the government to train its employees; it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." *Segal v. City of New York,* 459 F.3d 207, 219 (2d Cir. 2006) (emphasis in original; citations omitted). In order to state a viable *Monell* claim, however, plaintiff must establish some constitutional violation. *Id.* (noting that where "district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* was entirely correct"); *see also Ricciuti v. New York City Transit Auth.,* 124 F.3d 123, 132 (2d Cir. 1997) (there can be no inadequate training and supervision claim against a supervisory body "without a finding of a constitutional violation by the persons supervised"); *Mangino v. Inc. Village of Patchogue,* 739 F. Supp. 2d

205, 259 (E.D.N.Y. 2010) (noting that when a plaintiff lacks "any underlying claim of a deprivation of a constitutional right, the claim of municipal liability on the part of the municipal defendant must be dismissed as well").  As it has been determined supra that there was no underlying constitutional violation, the cause of action for municipal liability must also be dismissed.

### D.  Conspiracy - All defendants

In her Memoranda of Law in opposition, plaintiff argues, seemingly for the first time, that the allegations in her complaint state a §1983 conspiracy claim against all defendants.  In fact, she notes that the "Cablevision Defendants did not address or attempt to eliminate issues of fact as to these allegations pursuant to 42 U.S.C. §1983."  Pls' Mem. in Opp/Cablevision at 19.  Cablevision's failure to address this claim was clearly rooted in its belief that no such claim existed – "throughout this five-year proceeding, which has included three separate complaints, Plaintiff has never alleged a §1983 cause of action against the Cablevision Defendants." Cablevision Reply at 9; *see also* County Reply at 6 (noting that plaintiff has alleged the §1983 conspiracy claim "for the first time" in her opposition papers).

The cause of action that plaintiff belatedly claims to be one for §1983 conspiracy has always been titled "42 U.S.C. § 1985 Against all Defendants collectively" and contains no mention whatsoever of §1983.  Although it contains allegations of conspiracy, those allegations clearly claim race-based conspiracy.  The Amended Complaint added language to these allegations regarding conduct against "innocent minority persons" such as plaintiff.  Am. Compl. ¶¶169-71.  In the Second Amended Complaint, plaintiff adds language that bolsters her intention to state a claim under §1985 based upon her race.  *See* 2d Am. Compl. ¶167 (identical to Am. Compl. ¶168 but for the addition of the words "because of her race" at the end of the paragraph);

28

2d Am. Compl. ¶¶166, 168, 170-71 (adds phrase "African American woman").

As defendants are entitled to fair notice of the nature of plaintiff's claims, "it is inappropriate to raise new claims for the first time in submissions in opposition to a summary judgment motion." *Thomas v. Egan,* 1 Fed.Appx. 52, 54 (2d Cir. 2001). Raising a claim in this manner will "inevitably prejudice the defendants." *Brutus v. Silverseal Corp.,* 2009 WL 4277077, at *1 n.2 (S.D.N.Y. Nov. 24, 2009) (*quoting Beckman v. United States Postal Serv.,* 79 F. Supp. 2d 394, 407 (S.D.N.Y. 2000)). "'A party is not entitled to amend [her] complaint through [her] memoranda, and, therefore, the Court may decline to consider [her §1983 claim] on this basis alone." *Reyes v. Fairfield Prop.,* 661 F. Supp. 2d 249, 263 (E.D.N.Y. 2009) (*quoting Butvin v. DoubleClick, Inc.,* 2000 WL 827673, at *13 (S.D.N.Y. 2000) (citations omitted)). In the current case, it is unnecessary to determine whether allowing her to convert her claim at this late date will prejudice the defendants as any claim for §1983 conspiracy fails as a matter of law.

To establish a §1983 conspiracy, pla intiff must prove "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir. 1999). Although a successful §1983 claim requires evidence of state action, liability may be imposed upon private individuals pursuant to a conspiracy theory. *Ciambriello v. County of Nassau,* 292 F.3d 307, 324-25 (2d Cir. 2002). However, a §1983 conspiracy claim fails as a matter of law where there is no underlying constitutional violation. *See Curley,* 268 F.3d at 72; *Singer,* 63 F.3d at 119; *Beckles v. City of New York,* 2011 WL 722770, at *6 (S.D.N.Y. Feb. 25, 2011). As it has been established that there was no constitutional violation, there can be no conspiracy.

In addition, plaintiff has not established state action by Cablevision. A private entity may

be found to have acted under color of state law when it "exercises power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *McCarthy v. Wachovia Bank, N.A.,* 2011 WL 79854, *8 (E.D.N.Y. Jan. 11, 2011) (*quoting Nealy v. Berger,* 2009 WL 704804, *4 (E.D.N.Y. Mar. 16, 2009) (citation omitted)). Section 1983 liability attaches "only if there is a sufficiently 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.'" *Dunn v. Carrier,* 137 Fed.Appx. 387, 389 (2d Cir. 2005) (*quoting Brentwood Acad. v. Tennessee Secondary Athletic Ass'n,* 531 U.S. 288, 295 (2001) (internal quotation omitted)); *see also Blount v. Swiderski,* 2006 WL 3314635, at *18 (E.D.N.Y. Nov. 14, 2006) (plaintiff must introduce evidence that "the defendants acted in a willful manner, culminating in an agreement, understanding, or meeting of the minds, to violate his rights").

A §1983 conspiracy claim based on conclusory allegations and unsubstantiated statements may not withstand a summary judgment motion where "the record is devoid of any proof of an agreement among Defendants to act in concert to violate Plaintiff['s] contitutional rights. *Rose v. Julliano,* 2008 WL 5233178, at *7 (E.D.N.Y. Dec. 8, 2008); *see also Dowlah v. Dowlah,* 2010 WL 889292, at *8 (E.D.N.Y. Mar. 10, 2010) (plaintiff presented only bald assertions and conclusory allegations of conspiracy, but did not allege a close nexus, joint engagement, or unlawful agreement to form a conspiracy between the individual defendant and the state actor). Allegations of conspiracy must "allege with at least some degree of particularity overt acts which defendants engaged in which were reasonably related to the promotion of the alleged conspiracy." *Fariello v. Rodriguez,* 148 F.R.D. 670, 677 (E.D.N.Y. 1993) (citations omitted), *aff'd,* 22 F.3d 1090 (2d Cir. 1994); *see also Gillard v. Gaffney,* 2009 WL 2045151, at *4 (E.D.N.Y. Jul. 9, 2009) ("'Diffuse and expansive allegations are insufficient' to sustain a

conspiracy claim, 'unless amplified by specific instances of misconduct'") (*quoting Ciambriello,* 292 F.3d at 325).

Mitchell argues that there was an "agreement" between County defendants and the Cablevision defendants to have her arrested. Pl. Mem. in Opp/Cablevision, at 21. She further point to an "ongoing relationship and regular practice" of Cablevision supplying the police with its case files, *see* Pl. Mem. in Opp/Cablevision, at 21, and its practice of using the County "as a collection agency." *Id.* at 23. The mere fact that a party has "utilized state statutes to pursue a state court remedy against the plaintiff does not constitute 'state action' by private parties." *McCarthy,* 2011 WL 79854, *8 (citations omitted); *see also Dunn,*137 Fed.Appx. at 389 (merely cooperating in a police investigation does not constitute state action). In addition, "[c]ommunications between a private and a state actor, without facts supporting a concerted effort or plan between the parties, are insufficient to make the private party a state actor." *Fisk v. Letterman,* 401 F. Supp. 2d 362, 377 (S.D.N.Y. 2005). Plaintiff's general, nonspecific allegations regarding a relationship between the defendants cannot support a finding that Cablevision was a state actor for purposes of a §1983 conspiracy claim, and thus any such claim must fail.

## III. State Law claims

Having dismissed plaintiff's federal claims, I must decide whether it is appropriate to exercise pendent jurisdiction over her remaining state law claims. "Federal courts, absent exceptional circumstances, should abstain from exercising pendent jurisdiction when federal claims in a case can be disposed of by summary judgment." *Walker v. Time Life Films, Inc.,* 784 F.2d 44, 53 (2d Cir. 1986). The Second Circuit has further instructed that "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered

under the pendent jurisdiction doctrine-judicial economy, convenience, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state law claims." *Valencia ex rel. Franco v. Lee,* 316 F.3d 299, 305 (2d Cir. 2003) (*quoting Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n.7 (1988)).  As none of these factors favor retaining jurisdiction, I decline to exercise pendent jurisdiction over plaintiff's state law claims.  Accordingly, the remaining state law claims against the County defendants (negligence) and the Cablevision defendants (negligent hiring, supervision, and retention) are dismissed without prejudice.[9]

## CONCLUSION

The court finds that the defendants are entitled to judgment as a matter of law, dismissing all federal claims and the state law false arrest and malicious prosecution claims.  As to the remaining state claims, the court declines to exercise supplemental jurisdiction.  Accordingly, the defendants' motions for summary judgment are granted, and the Clerk of the Court is directed to close the case.

Dated: Central Islip, New York
   March 24, 2011

SO ORDERED:

  /s/ William D. Wall
  WILLIAM D. WALL
  United States Magistrate Judge

---

[9]Plaintiff's second amended complaint contains two "causes of action" for vicarious liability, the Eighth against the Cablevision defendants and the Ninth against the County defendants.  These claims are not cognizable causes of action as "vicarious liability is not an independent cause of action, under either federal or state law.  It is merely a doctrine that enables, in certain circumstances, 'a defendant who played no part in the occurrence causing the plaintiff's injury [to] be held legally responsible for the plaintiff's injury caused by the tort of another person.'" *Broderick v. Research Found. of State Univ. of New York,* 2010 WL 3173832, at *3 (E.D.N.Y. Aug. 11, 2010) (*citing* 14 N.Y. Prac., Torts §9:2).